Argued March 6, affirmed June 11, 1969

FLEMING et ux, *Respondents, v.*
WINEBERG, *Appellant.*

455 P2d 600

*Bruce W. Williams,* Salem, argued the cause for appellant. On the brief were Williams, Skopil, Miller & Beck, Salem.

*Lloyd V. Weiser,* Portland, argued the cause for respondent. With him on the brief were Weiser, Bowles & Young, Portland, and Paul Reeder, Hillsboro.

Before Perry, Chief Justice, and Sloan, Goodwin, Holman and Hammond,[*] Justices.

## GOODWIN, J.

The unpaid sellers of 95 head of registered Guernsey cattle brought a suit in equity to compel an assignee of the buyer's interest in the cattle to pay for them. The assignee appeals a decree requiring payment.

The cattle were sold under a conditional-sale contract. The buyer by assignment subsequently surrendered the cattle to the defendant, and by the time of this suit was no longer a lucrative defendant. The cattle could have been repossessed from the defendant, but changes in the makeup of the herd made exact restitution impossible. The sellers, moreover, had grown weary of milking cows, and sought various ways, short of repossession, to obtain payment of the balance due under their conditional-sale contract.

The sellers' first recourse to litigation was an action at law to recover for goods sold and delivered. In that action the sellers took a voluntary nonsuit. The record in the present case leaves the reason for the nonsuit in the realm of mystery.

The third amended complaint in the present suit alleges the sale and delivery of the cattle to the original buyer, the assignment of the buyer's interest in the cattle to the defendant, and the sellers' demand for payment of the balance due under the contract. The pleading alleges that the defendant had accepted the assignment of the contract and is estopped by the

---

[*] Hammond, J., did not participate in the decision of this case.

following conduct from denying that he assumed and agreed to pay the balance due:

"1. In permitting his agent, Griffith, to pay for the cattle under said contract out of the defendant Wineberg's farm account.

"2. In permitting some of the said cattle to be sold and the proceeds thereof to be credited to the defendant Wineberg's account or toward the payments due on the contract to the plaintiff.

"3. In permitting milk produced from said cattle to be sold and credited to the defendant Wineberg's account.

"4. In permitting the expenses of caring for said cattle to be paid from said defendant Wineberg's account.

"5. In including the income and expenses and depreciation of said cattle in his, Wineberg's, income tax returns for all years beginning January 1, 1964.

"6. In negotiating with the plaintiffs to arrange for the sale of said cattle to a third party.

"7. In demanding and receiving all of the records of said cattle from Griffith.

"8. In demanding and receiving an assignment from Griffiths under said contract and in thereafter also demanding and receiving a bill of sale from said Griffiths to said cattle.

"9. In generally accepting the benefits of said contract.

"10. In exercising dominion and control over said cattle beginning on or about July, 1964, at the time the defendant, Wineberg, actually discovered the existence of said contract and that the cattle covered thereby were on his farm.

"11. In permitting Griffith to negotiate with the plaintiffs to purchase said cattle.

"12. In continuing the employment of Griffith after becoming aware of the purchase of said cattle and the payments for the purchase of said cattle

and the care of said cattle from the defendant Wineberg's account.

"13. In demanding that the cattle be placed and held in the defendant Wineberg's name.

"14. In warning the plaintiffs and Griffith not to do anything with said cattle.

"15. In failing to affirmatively disaffirm said contract upon discovery of the purchase of said cattle by his agent Griffith.

"16. In failing upon said discovery to require the cattle to be moved from his property and returned to the plaintiffs."

The evidence tended generally to corroborate the quoted allegations, and the trial court made findings of fact favorable to the plaintiff. The principal substantive problems in this case arise out of two failures on the part of the parties: the plaintiffs did not identify in the trial court a legal theory that would justify the relief they obtained; and the defendant relied excessively upon a defense of *res judicata* which obscured other defenses that might have been made on the merits.

The plaintiffs first proposed a theory that the defendant had ratified a contract made by his agent (the original buyer). There was no evidence to support this theory.

The plaintiffs' second theory was that the defendant, by his conduct, was estopped to deny that he had accepted the assignment of the contract from the original buyer and had assumed and agreed to pay the balance due thereunder. The evidence did not support estoppel because the sellers did not rely upon the defendant's conduct, and knew at all times that his attitude was intransigent.

The third theory, interwoven with the second, was

that the defendant was unjustly enriched and ought to make restitution, not of the cattle, but of their reasonable market value. There was evidence to support this theory if it is valid in law.

The trial judge concluded that the facts supported recovery by the plaintiffs on the second and third theories. Recovery was assessed at the reasonable market value of the cattle ($28,000), which the court held was the amount by which the defendant had been unjustly enriched.

The defendant again asserts that the plaintiffs' abortive action at law which ended in a voluntary nonsuit somehow had deprived the trial court of jurisdiction to hear the case at bar. The defendant has supplied neither the trial court nor this court with authority to support the novel proposition that a nonsuit is a judgment in bar. We assume that this defense, with which the defendant was preoccupied at the trial, was the result of a misapprehension concerning the doctrine of collateral estoppel.

■ The first action produced no decision that would result in a collateral estoppel in this case. Abortive litigation ending in a voluntary nonsuit may provide an adversary with evidence, in the form of inconsistent pleadings or testimony, but the voluntary nonsuit decides nothing except that the adversary has temporarily quit the field. Since a judgment of nonsuit does not reach the merits, such a judgment does not establish collateral estoppel on any issue in the case. See ORS 18.250. For a statutory definition of the effect of a judgment on matters actually litigated to judgment, see ORS 43.160.

The second of the defendant's assignments of error challenges the admission of evidence concerning the

defendant's conduct antedating the assignment. The plaintiffs had alleged that the assignment was given and accepted on December 9, 1965, and that, subsequent thereto, the defendant performed acts which the plaintiffs alleged were inconsistent with the defendant's refusal to pay for the cattle. The objection during the trial and here is that certain evidence of other similar acts of dominion and control over the cattle prior to December 9, 1965, was irrelevant. The plaintiffs had also alleged, however, that certain of the defendant's conduct occurred before as well as after the date of the assignment.

■ The plaintiffs' evidence tended to prove that the cattle were a valuable addition to the defendant's farm; that the defendant had not only sold the milk on his own account, but had culled the herd and sold calves and cows; and that the defendant had set the cattle up in his tax records and had derived a substantial tax advantage from the herd in the form of depreciation and expenses. Some of this conduct occurred before, and some after, the assignment. The evidence was, therefore, wholly consistent with the plaintiffs' allegations that the defendant had conducted himself at all material times in a manner that would make it unjust for him to keep the cattle without paying for them. There was no error in receiving the challenged evidence.

The third assignment of error challenges the sufficiency of the evidence offered to prove unjust enrichment and the availability of unjust enrichment as a basis for relief.

The evidence tended to show that 95 head of registered Guernsey cattle were worth at least $28,000. The court allowed the sellers the reasonable market

value of the cattle upon condition that the sellers cause the proper registration documents to be supplied the defendant.

The principal line of defense on the issue of market value and unjust enrichment was that the defendant owed the plaintiffs nothing. The defendant took the position that he had dealt solely with the original buyer, and had taken over the herd because of defaults by the original buyer in obligations owed the defendant. The defendant claimed that he had fed and housed the cattle at great expense; that the defendant did not want the cattle; that he was losing money every day they remained on his farm; and that he had done the owner a favor in keeping the herd intact. From the witness stand he offered for the first time (over the strenuous objection of his attorney) to give the cows back to the sellers. Most of this evidence was unresponsive to the issue of market value, although it may have been relevant on the ultimate issue of the relief to which the plaintiffs might be entitled.

Notwithstanding the proof that the defendant for a substantial time had treated the cattle for all practical purposes as his own, the question remains whether the defendant could be required to pay to the original sellers the reasonable market value of the herd when he had never agreed to pay the plaintiffs anything.

■ The American Law Institute's Restatement of Restitution (1937) was the first comprehensive modern-day treatise on the topic of restitutionary remedies. The basis of the restitution remedy is unjust enrichment. See Restatement of Restitution 12, § 1. It has been said:

"* * * The *Restatement* reporters, Profes-

sors Warren Seavey and Austin Scott, forged boldly ahead, bringing the great bulk of restitutionary remedies, both legal and equitable, under the umbrella of 'restitution,' and declared 'tort,' 'contract,' and 'restitution' to be the three primary areas in the overall classification of the law \* \* \*." Note, *Restitution: Concept and Terms,* 19 Hastings L J 1167, 1169-1170 (1968).

See Lacy, *Restitution—1959 Oregon Survey,* 39 Or L Rev 57 (1959).

Even though restitution is given equal dignity, if not equal antiquity, with tort and contract in the Restatement, restitution as a category of relief is not altogether free from confusion.

"The appearance of the *Restatement of Restitution* marks the emergence of this category of the law into adolescence, and true to form, it trips over its own feet, grows at a phenomenal rate and is today still somewhat confused as to what it is and where it is supposed to be in the broad scheme of the law \* \* \*." Note, 19 Hastings L J, supra at 1170.

The pleadings in this case, and the manner in which it was tried, illustrate the kind of confusion noted by the law review writer.

First, the plaintiffs sued in equity for a money judgment. If all they wanted was a money judgment, they should have brought an action at law. ORS 11.020. *Carey v. Hays,* 243 Or 73, 409 P2d 899 (1966). The sellers' contract entitled them to repossess their security. They did not ask for such relief. Under any definition of an election of remedies, the instant case would appear to qualify. The unpaid sellers not only have not sought to repossess the goods sold under their title-retaining contract, but they have exhibited considerable industry in avoiding that result.

Having elected to seek a money judgment, the plaintiffs had to prove either that the defendant had assumed and agreed to pay the contract balance, which he obviously had not, or that the defendant became legally obligated to pay something for the cattle because his conduct amounted to the equivalent of an agreement or undertaking to pay.

■■ The case has been tried; the facts are not seriously in dispute, and relief has been granted. The relief granted could have been granted in an action at law. Under ORS 16.460(3) no cause shall be dismissed solely because it was brought on the wrong side of the court. The defendant did not, by a timely demurrer in the lower court, question equitable relief, and, accordingly, the case was tried without a jury. The defendant's failure to protest can be construed as a waiver of a jury trial. *Ward v. Town Tavern et al.*, 191 Or 1, 41-42, 228 P2d 216, 42 ALR2d 662 (1951). So long as the relief granted was relief to which the plaintiffs were entitled, the judgment need not be reversed merely because the suit was tried on the wrong side of the court. See opinion on rehearing in *Flaherty v. Bookhultz et al*, 207 Or 462, 472-473, 291 P2d 221, 297 P2d 856, 858 (1956); *Ward v. Town Tavern et al.*, supra.

On the facts found by the trial court, we do not believe it is necessary to rely upon equitable estoppel to sustain the judgment. The defendant did not agree to pay for the cattle, and it strains estoppel to say that his conduct estops him from denying that he agreed to pay. The facts, however, support the granting of restitution on the ground of unjust enrichment.

While it is true that the defendant offered at the trial to return the cattle, it is equally true that until his appearance on the witness stand his conduct was

ample evidence that he intended neither to pay for the cattle nor to return them. His dealings with the cattle, for tax and business purposes, were all inconsistent with any intent to return the cattle to the sellers.

■■ Restitution is said to be applicable in any situation in which one person is accountable to another on the ground that otherwise one would unjustly benefit or the other would unjustly suffer loss. Restitution includes, but is not limited to, the subject area of "quasi contracts." Restatement of Restitution, General Scope Note at 1, 2 (1936).

The earliest common-law courts entertained restitutionary proceedings in the nature of debt and account. Difficulties in procedure in these two forms of action, however, frequently frustrated relief. Plaintiffs accordingly sought the aid of the Chancellor, whose jurisdiction to order persons to do that which in good conscience they ought to do had led to the creation of an independent court. In time, the action of assumpsit in the law courts was devised to meet the competition of the Chancellor. Eventually, actions in assumpsit came to be allowed where the promise could be inferred from the circumstances. These contracts were called "contracts implied in fact."

"* * * Finally, the action of assumpsit was extended to cases where there was neither a promise in specific words nor one inferred from the facts, provided there existed a debt which the defendant ought to pay. In alleging this debt it was enough for the plaintiff to state its source in general terms, followed by a statement that, being indebted, the defendant promised to pay. This general and indefinite statement of the source of the debt is the beginning of what were later known

as the common counts in the action of general assumpsit, the use of the word 'general' resulting from the desirability of distinguishing the action from that of special assumpsit, the ordinary action for breach of contract and the only one permissible where no debt arose. These common counts were expanded to include actions for goods sold, money lent, money had and received, money paid to the defendant's use or at the defendant's request, work and labor, and account stated. This extension of the action of assumpsit was a great step forward, since in many of these cases either there was no remedy at law or the remedy, such as that of the action of debt, involved serious procedural difficulties." Restatement of Restitution, Introductory Note at 6, 7.

Oregon has long recognized implied contract and actions on the common counts of assumpsit. See, e.g., *Baldro v. Tolmie*, 1 Or 176 (1855). The facts in the case at bar appear to fit into the category of those in which an action for goods sold and delivered would have been appropriate at common law.

While it is true that one can take an assignment of property without being bound to pay for the property, one can be required to make restitution in order to prevent unjust enrichment. It is clear that the defendant used the cattle as his own. He sold, or had sold on his account, a number of cattle culled from the herd, and added the increase to his herd. In substance it matters not whether the defendant's conduct was tortious. His appropriation of the cattle without either returning them or paying for them amounted to unjust enrichment. The effect of the decree was to restore the plaintiffs to their original position to the extent that the fair market value of the cattle could make the plaintiffs whole. This was

a proper disposition of the case. *Daniels v. Foster & Kleiser,* 95 Or 502, 507, 187 P 627 (1920) (assumpsit). See also Restatement of Restitution, § 56.

Affirmed.