Argued and submitted March 28, affirmed July 28, 1980

GOLDEN WEST INSULATION, INC.,
*Respondent,*
*v.*
STARDUST INVESTMENT CORPORATION,
*Appellant,*

(No. A7806-10181, CA 13665)

GOLDEN WEST INSULATION, INC.
*Appellant,*
*v.*
STARDUST INVESTMENT CORPORATION,
*Defendant,*
IGNATOVICH,
*Respondent.*

(No. A7806-10181, CA 13665)

615 P2d 1048

[494]

Paul J. Kelly, Jr., of Glasgow & Kelly, Portland, argued the cause and filed briefs for appellant Stardust Investment Corp. and respondent Ignatovich.

Peter C. Richter, Portland, argued the cause for respondent/appellant Golden West Insulation, Inc. With him on the briefs were James N. Westwood, and Miller, Anderson, Nash Yerke & Wiener, Portland

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges, and Howell, Judge pro tempore

HOWELL, J. pro tempore.

**HOWELL, J.** pro tempore

Plaintiff filed this suit to enjoin its franchisee from using the names "Golden West" and "Golden West Cellulose Insulation" and for damages for breach of the franchise agreement. The defendants alleged various affirmative defenses and counterclaims for damages for breach of warranties, breach of the franchise agreement, and unjust enrichment. The cause was tried as a suit in equity. The trial court entered findings and a decree dismissing the suit against defendant Ignatovich and awarding him attorney fees, enjoined defendant Stardust Investment Corporation ("Stardust") from using the "Golden West" name, and entered a judgment against defendant Stardust for damages and attorney fees.

Only plaintiff and defendant Stardust appeal.[1] Plaintiff contends that defendant Ignatovich was not entitled to an award of attorney fees. Defendant Stardust makes numerous contentions: that the franchise agreement with plaintiff was illegal and unenforceable because it violated both Oregon and federal antitrust laws; that the franchise agreement violated California franchise investment law; that the trial court erred in finding that plaintiff had not materially breached the franchise agreement and that plaintiff was not unjustly enriched "by that portion of the decree enjoining defendant Stardust's continued use of the Golden West name * * *"; and that plaintiff was not entitled to an award of attorney fees.

We affirm the decree of the trial court in all particulars.

## FACTS

Plaintiff, Golden West, is a California corporation that franchises insulation dealerships under the "Golden West" name. In connection with its licensing of dealerships, plaintiff contracts to sell to each

---

[1] References in the opinion to "defendant" refer only to Stardust.

franchisee its brand of cellulose insulation which is blown into the walls of existing buildings by machine. On May 20, 1977, David Perry, a California attorney, entered into a franchise contract with plaintiff. At the time Perry signed the contract, he was acting as Ignatovich's attorney and agent. Thereafter, the contract was assigned by Perry to defendant Stardust, and defendant Ignatovich became its president.

In pertinent part, the contract contained the following provisions:

1. Plaintiff granted defendant Stardust the right to use the name "Golden West" in Multnomah, Washington, and part of Clackamas Counties, Oregon. Purchase price of the franchise was $75,000, reduced to $67,700 by the value of a truck which Stardust agreed to provide for itself. Defendant was to pay $10,000 down plus a $1 per bag surcharge on the first 57,700 bags of insulation to be sold by plaintiff to defendant.

2. Defendant Stardust also leased from plaintiff three machines designed to install insulation.

3. Plaintiff agreed to supply all defendant's insulation needs, and defendant agreed to purchase 1,000 bags of insulation from plaintiff during each of the first three months and 3,000 bags of insulation each month thereafter over the 20-year term of the agreement.

4. In addition to the right to use the "Golden West" name and related terms, defendant obtained the right to conduct its business of selling and installing insulation in accordance with the "specific directions and processes furnished" by plaintiff. Defendant agreed not to use any product or method unless approved in advance by plaintiff.

5. The contract further provided that plaintiff could terminate it upon breach or upon 30 days' notice and that upon termination defendant would

stop using the name "Golden West" and return any of plaintiff's property in its possession.

After the execution of the contract, defendant Ignatovich moved to Portland, Oregon, and began operations as Stardust Investment Corporation, doing business as Golden West Insulation Company of Portland. Plaintiff assisted Ignatovich in training salesmen and installers, and in providing equipment and sales literature. Stardust purchased and used 24,400 bags of insulation exclusively provided by plaintiff from July, 1977, to April, 1978.

In April, 1978, Stardust discontinued its purchase of insulation from plaintiff and began to obtain its insulation from another company. It continued to operate under the "Golden West" name and methods of business until plaintiff discovered Stardust's refusal to purchase insulation. Plaintiff terminated the franchise agreement on July 12, 1978, and thereafter filed the instant suit to enjoin Stardust and Ignatovich from using the "Golden West" name.

DEFENDANT'S ASSIGNMENTS OF ERROR

Stardust does not challenge the allowance of the injunction nor does it challenge the court's finding that it breached the contract. Rather, it seeks to reduce or eliminate the damages awarded against it by interposing various affirmative defenses. We find these defenses to be without merit.[2]

1. *The Anti-Trust Defense*

Stardust asserts that its contractual arrangement with plaintiff constituted an illegal tying arrangement in violation of Oregon Antitrust law, ORS 646.725,[3] and § 1 of the Sherman Act (15 USC § 1

---

[2] We note that the trial court entered a specific finding of fact that Ignatovich and Perry, his attorney, "were unreliable witnesses and their testimony was completely ignored."

[3] ORS 646.725 provides as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal."

[497]

*et seq.*).[4] We will first determine whether the contractual arrangement violates our state law. According to ORS 646.715(2):

> " * * * The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS 136.617, 646.705 to 646.805 and 646.990."

Because there appear to be few Oregon decisions in this area of the law, we will frequently refer to decisions of federal courts.

The United States Supreme Court has defined a tying arrangement as

> " * * * an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. * * * [Tying agreements] deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. * * * *Northern Pac. R. Co. v. United States,* 356 US 1, 5-6, 78 S Ct 514, 2 LEd 2d 545 (1958).

Because tying agreements deny competing sellers access to the tied market and also deny purchasers the freedom to choose among the competing tied products, these agreements fare harshly under the laws forbidding restraints of trade. *Id.* at 6. Section 1 of the Sherman Act prohibits those tying arrangements which *unreasonably* restrain competition. *Id.* at 5. But the United States Supreme Court has also followed a rule of *per se unreasonableness* with respect to tying arrangements so that a party challenging the arrangement as violative of § 1 of the Sherman Act need not present elaborate proof as to the precise harm of the tie-in. *Id.*

---

[4] Section 1 of the Sherman Antitrust Act (15 USC § 1) provides in pertinent part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

■ To prove the *per se* illegality of a tying agreement, the party challenging the agreement is required to show:

   (1) that the arrangement involves two distinct products and requires that one (the tying) product may not be obtained unless the other (the tied) product is also purchased;

   (2) that the seller possesses sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product; and

   (3) that a "not insubstantial" amount of interstate commerce is affected.

*See Fortner Enterprises v. U.S. Steel,* 394 US 495, 498-99, 89 S Ct 1252, 22 L Ed 2d 495 (1969) (hereinafter *Fortner I*); *Northern Pac. R. Co. v. United States, supra* at 6; *Siegel v. Chicken Delight, Inc.,* 448 F2d 43 (9th Cir 1971), *cert. denied* 405 US 955, 92 S Ct 1172-73, 31 L Ed 2d 232 (1972). *Also see Harold Butler Enterprises #97, Inc. v.* Vanlandingham, 264 Or 414, 425, 505 P2d 1149 (1973) (decided prior to enactment of ORS 646.725); 2 Kintner, Federal Antitrust Law 227-28, § 10.53 (1980).

Defendant has sought to prove the *per se* illegality of the tying arrangement but also argues that it may still prevail by proving that the tying arrangement was in fact unreasonable and in violation of the state and federal antitrust laws. *See Fortner I, supra* at 500.

In particular, defendant assigns as error the trial court's finding that it had not sustained its burden to prove that plaintiff had sufficient economic power to restrain competition in the market for the tied product. Defendant argues that the "tying product" in this case is the "exclusive license to use the Golden West name and method of operation," and that the "tied product" is the specified quantities of Golden-Therm insulation. Although plaintiff argues that the "Golden West" name and the Golden-Therm insulation

are actually one product and that the arrangement was a requirements contract and not a tying agreement, we will assume for the purpose of our decision that defendant has proven the existence of two separate products and a tying arrangement.

Defendant then argues that it has proven that plaintiff possesses sufficient economic power over the "Golden West" name and method of operation to appreciably restrain competition in the market for insulation. First, defendant argues that the court may presume sufficient economic power over the tying product because plaintiff possesses the exclusive rights to the "Golden West" name, which is a service mark registered with the United States Patent Office. Second, defendant argues that even if sufficient economic power is not presumed, it has *in fact* proven that plaintiff possessed sufficient economic power to appreciably restrain competition in the market for insulation.

We begin our analysis by noting that the United States Supreme Court has said that its decisions on the issue of "sufficient economic power"

" * * * do not require that the defendant have a monopoly or even a dominant position throughout the market for a tying product. * * * They do, however, focus attention on the question whether the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.

"Without any such advantage differentiating his product from that of his competitors, the seller's product does not have the kind of uniqueness considered relevant in prior tying-clause cases. * * *" *U. S. Steel Corp. v. Fortner Enterprises, Inc.,* 429 US 610, 620-21, 97 S Ct 861, 51 L Ed 2d 80 (1977) (hereinafter *'Fortner II'*). (Footnotes omitted.)

[500]

The United States Supreme Court has held that patents and copyrights are tying products that are "sufficiently unique to give rise to a presumption of economic power." *Id.* at 619.

> "The requisite economic power is presumed when the tying product is patented or copyrighted, International Salt Co. v. United States, 332 US 392, 92 L Ed 20, 68 S Ct 12; United States v. Paramount Pictures, Inc., 334 US 131, 92 L ed 1260, 68 S Ct 915. This principle grew out of a long line of patent cases which had eventuated in the doctrine that a patentee who utilized tying arrangements would be denied all relief against infringements of his patent. [Citing cases.] These cases reflect a hostility to use of the statutorily granted patent monopoly to extend the patentee's economic control to unpatented products. The patentee is protected as to his invention, but may not use his patent rights to exact tribute for other articles." *United States v. Loew's, Inc.,* 371 US 38, 45-46, 83 S Ct 97, 9 L Ed 2d 11 (1962).

Defendant argues that, in the present case, the requisite economic power may be presumed because the tying product is the "Golden-West" service mark. Perhaps the most persuasive authority the defendant cites is *Siegel v. Chicken Delight, supra,* in which the court held:

> "Just as the patent or copyright forecloses competitors from offering the distinctive product on the market, so the registered trade-mark presents a legal barrier against competition. It is not the nature of the public interest that has caused the legal barrier to be erected that is the basis for the presumption, but the fact that such a barrier does exist. Accordingly we see no reason why the presumption that exists in the case of the patent and copyright does not equally apply to the trade-mark." 448 F2d at 50.

The *Siegel* court concluded that the Chicken Delight trademark—which is distinctive because it possesses goodwill and public acceptance unique to it and not enjoyed by other fast food chains—was a tying product that possessed sufficient market power as a matter of law. *Id.*

Since the *Siegel* decision, other courts have also reasoned that the presumption of sufficient economic power applicable to patents and copyrights should also apply to trademarks. *See, e.g., Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F2d 1002 (5th Cir), *cert. denied* 409 US 1086, 93 S Ct 688, 34 L Ed 2d 673 (1972); *Redd v. Shell Oil Co.,* 1974-2 Trade Cas. ¶ 75,390 (D Utah 1974), *rev'd* 524 F2d 1054 (10th Cir 1975), *cert. denied* 425 US 912, 96 S Ct 1508, 47 L Ed 2d 762 (1976); *Falls Church Bratwursthaus, Inc. v. Bratwursthaus Management Corp.,* 354 F Supp 1237 (ED Va 1973); *Mid-America ICEE, Inc. v. John E. Mitchell Co.,* 1973-2 Trade Cas. ¶ 74,681 (D Or 1973).

Nevertheless, courts generally have been reluctant to extend the presumption of sufficient economic power to trademarks. *Kintner, supra* at 245, § 10.58. These courts have explained that, although possession of a registered trademark allows a party to prevent competitors from duplicating the distinctive features of the mark—i.e. the name or symbol— the trademark does not at all prevent competitors from duplicating the distinctive features of the product. *See, e.g., Carpa, Inc. v. Ward Foods, Inc.* 536 F 2d 39 (5th Cir 1976); *Northern v. McGraw-Edison Co.,* 542 F2d 1336 (8th Cir 1976), *cert. denied,* 429 US 1097, 97 S Ct 1115, 51 L Ed 2d 544 (1977); *Capital Temporaries, Inc. v. Olsten Corp.,* 506 F2d 658 (2d Cir 1974); *Susser v. Carvel Corp.,* 332 F2d 505 (2d Cir 1964), *cert denied* 381 US 125, 85 S Ct 1364, 14 L Ed 2d 284 (1965) (trademark did not achieve such a degree of prominence so as to constitute a per se violation); *Cash v. Arctic Circle, Inc.,* 1980 Trade Cas. ¶ 63,095 (ED Wash 1979); *Esposito v. Mister Softee, Inc.,* 1976-2 Trade Cas. ¶ 61,202 (ED NY 1976).

We are persuaded by the line of cases that do not automatically presume sufficient economic power when the tying product is a trademark. Trademarks are different from patents and copyrights. In order to

obtain a patent, one must invent a "new," "useful," and "nonobvious" product, process, machine or design. The patent gives the patentee the exclusive right to make, use and sell devices which embody the claimed invention. *See* 1 McCarthy, Trademarks and Unfair Competition, 126-28, § 6.2 (1973). In order to obtain a copyright, one need only author an "original" writing, photograph, musical work, or work of art. The copyright gives the author the right to prevent others from copying his work. *Id.* at 133-35, § 6.4. On the other hand, one may obtain a trademark for a product (or a "service mark" for a service) if the mark, symbol, design or words that may function as a trademark are used to identify and distinguish goods or services. *Id.* at 44-46, § 2.2 . The trademark gives the owner the right to prevent use of the mark by others when that use is likely to cause confusion or mistake or to deceive. *Id.* at 127, § 6.3. But, where a patentee or copyright owner may prevent others from copying *the product* upon which he holds a patent or copyright, the holder of a trademark, merely by virtue of the trademark, may not prevent others from copying his product and selling the product under a different mark. *Id.* at 58, § 2.7. Such monopolistic power is obtainable only with a patent or copyright. *See generally id.* at 49-54, § 2.5.

The "exclusive right" of a trademark owner to prevent the unauthorized use of his mark may present a legal barrier to the use of the mark, but does not present a barrier to competition in the sale of the same product under different marks. In other words, the mere exclusive ownership of a trademark does not monopolize or foreclose competition in the market for the product. *See* 1 Callmann, Unfair Competition, Trademarks and Monopolies 461, § 15.5 (1967). "This does not mean that a trademark owner may not be dominant in the market. But the trademark, as such, does not result in market dominance although it might aid the manufacturer of the trademarked article who seeks such status." 2 Callmann, *supra* at 173, § 38.2(b)(2). For example, a manufacturer may spend

millions of dollars to advertise its trademark and to acquire prominence, goodwill, public acceptance, and economic power. But not every trademark may be presumed to possess economic power by itself.

Accordingly, we hold that an exclusive trademark or service mark alone cannot create a presumption of sufficient economic power over the market for the tying product. The proper focus of concern is whether the trademark owner, by virtue of his trademark or any unique advantages, in fact has sufficient economic power in the market for the tying product to raise prices or impose other burdensome terms, such as a tie-in, with respect to any appreciable number of buyers within the market. *Fortner I, supra* 394 US at 504; *Carpa, Inc. v. Ward Foods, Inc., supra* 536 F2d at 48.

We now reach defendant's contention that it has in fact proven that plaintiff possesses sufficient economic power. Defendant argues that sufficient economic power was proved in this case by evidence that:

    (1)   in a few short years plaintiff has sold and set up 28 to 30 Golden West insulation dealerships in a four-state area;

    (2)   defendant was specifically seeking a Golden West franchise with the Golden West service mark and the Golden West special expertise; and

    (3)   plaintiff obtained a noncompetitive high price on the sale of the tied product, the insulation.

Because this action was tried in equity, our assignment is to "try the cause anew upon the record." ORS 19.125(3). Upon reviewing the record, we find that defendant failed to sustain its burden of proof on the key element of sufficient economic power. Defendant's evidence that plaintiff sold 28 to 30 franchises does not prove economic power where there may be an explanation for the willingness of buyers to purchase the franchise. *See Fortner II, supra,* 429 US at 618 n. 10. And the fact that plaintiff obtained a noncompeti-

tive price for insulation does not in itself prove sufficient economic power. *Id.* at 618.

As the *Fortner II* court said, "The question is whether the seller has some advantage not shared by his competitors in the market for the tying product." *Id.* at 620. The evidence presented by defendant has failed to indicate *who* are plaintiff's competitors in the insulating-service market and *what* advantage plaintiff uniquely possesses that gives it the economic power to raise prices or require burdensome terms. Defendant contends that the plaintiff's trademark makes the tying product unique. Defendant, however, has failed to present evidence of the uniqueness of plaintiff's trademark in relation to other trademarks for the same service. Without evidence indicating the competitive activity in the market for the tying product, we are unable to conclude that defendant has proven that plaintiff possesses the economic power and the unique advantage in the marketplace required to prove an illegal tying arrangement per se.

In addition, we conclude that defendant has failed to prove that the alleged tying arrangement is unreasonably in restraint of trade. Defendant has failed to prove the extent of competition in the industry and whether the degree of restraint allegedly caused by plaintiff's activities was unreasonable.

We therefore conclude that defendant has failed to prove an illegal tying arrangement in violation of Oregon antitrust law. For the same reasons as stated above, we conclude that defendant has failed to prove a violation of federal antitrust law.

## 2. *The California Franchise Investment Law Defense*

Defendant also assigns as error the trial judge's rejection of its defense of illegality of the franchise agreement based on California's Franchise Investment Law, Cal Corp Code § 31000 *et seq.* (West 1977).[5] This statute makes it unlawful for any

---

[5] The California Franchise Investment Law provides, in pertinent part, the following:

person to sell or offer to sell in California any franchise which has not been registered pursuant to that law. At the time of the execution of the franchise agreement between plaintiff and defendant, plaintiff had not complied with the provisions of the statute, although it did so later and notified defendant to that effect. Nevertheless, the contract provided that each party waived its rights under any franchise law.[6] Defendant argues that plaintiff's failure to comply with the statute renders the franchise sale illegal and therefore entitles defendant to the equitable defenses of illegality and unclean hands.

Even if the California statute applies to this contract, the parties specifically agreed that they waive "any and all rights available" under the California, Oregon and federal franchise laws. Because the

---

"**§ 31110. Registration of offer; necessity**

"On and after April 15, 1971, it shall be unlawful for any person to offer or sell any franchise in this state unless the offer of the franchise has been registered under this part or exempted under Chapter 1 (commencing with Section 31100) of this part."

Plaintiff argues that the franchise in question is exempted under the following provision:

"**§ 31100. Rule of commissioner**

"There shall be exempted from the provisions of Section 31100 any other transaction which the commissioner by rule exempts as not being comprehended within the purposes of this law and the registration of which he finds is not necessary or appropriate in the public interest or for the protection of investors."

Plaintiff cites a rule of the California Corporation Commissioner that exempts out-of-state sales. We, however, do not need to decide whether the franchise offer is exempted because, as we hold later in the text, the defendant's reliance on the defense of illegality is misplaced and incorrect.

[6] The contract provided the following:

"Each party agrees that this agreement does not constitute the sale of a franchise prohibited by California, Oregon, or Federal law. Each party further agreees [sic] that he understands the consequences of the franchise laws and has received all the information required by those laws even if they were applicable [sic] to this agreement. *Each party specifically waives any and all rights available to him or it under those laws.*" (Emphasis added.)

[506]

contract was to be performed in Oregon, and because defendant specifically waived all rights available under the California franchise laws, we hold that defendant was not entitled to raise the defense of illegality.[7]

### 3. *Plaintiff's alleged contractual breach.*

Defendant assigns as error the finding by the court that plaintiff had performed all conditions on its part as required by the contract. Defendant argues that plaintiff did breach certain contractual provisions by misrepresenting the quality of insulation and by delivering a quantity of defective and unusable insulation. Defendant argues that, because of these breaches, plaintiff failed to prove substantial performance of all its obligations and is therefore not entitled to prevail on its breach of contract claim.

■      The trial court found that defendant failed to prove misrepresentation of the quality of insulation, but that plaintiff did deliver some defective and underweight insulation. The court concluded that defendant was entitled to damages in the sum of $3,106.86 for the defective material.

Upon *de novo* review of the evidence, we conclude that plaintiff did substantially perform all of its obligations under the contract. The plaintiff's delivery of defective insulation was a breach for which defendant received damages, but was not a breach that should result in denial of plaintiff's rights to prevail on its breach of contract claim.

### 4. *The restitution claim*

■      Defendant's fourth assignment of error is that the trial judge erred in rejecting defendant's restitution claim based on unjust enrichment. Defendant argues that under the contract it paid about half of the total purchase price for the franchise within the first

---

[7] Because we conclude that plaintiff did not violate Oregon and federal antitrust laws and that the franchise contract is not illegal, we conclude that there is no merit to defendant's defense of unclean hands.

two years of the 20-year term of the agreement. Since defendant only enjoyed the franchise for 21 months before it was enjoined from doing so, it reasons that plaintiff was unjustly enriched by the amount of the defendant's payments, less the pro-rata amount attributable to the 21-month use of the license.

Restitution is based on a theory that one party should not be unjustly enriched at the expense of another. *See, e.g., Farmer v. Groves,* 276 Or 563, 568, 555 P2d 1252 (1976); *Fleming v. Wineberg,* 253 Or 472, 479-82, 455 P2d 600 (1969). The cases cited by defendant in support of restitutionary relief, however, are cases involving the rescission of a contract. In the instant case, the defendant breached the contract, by refusing to purchase insulation, but continued to use the plaintiff's trade name. We are, of course, concerned about providing a restitutionary remedy to a party who is in substantial default. *See* 5A Corbin on Contracts 3, § 1122 (1964). We also note that defendant is seeking restitution of payments it had voluntarily made. *Cf. Reiver v. Safeguard Precision Products, Inc.,* 240 Pa Super 572, 361 A2d 371, 373 (1976).

Upon reviewing the evidence, however, we conclude that defendant is not entitled to restitution because defendant has failed to prove that the plaintiff was unjustly enriched. The contract provided for substantial payments by defendant in the first few years of the franchise. But the contract did not provide for a pro rata system of payments or for a refund of any payments upon termination. When defendant agreed to pay for the franchise during the early part of the franchise operation, it knew that it might be unable to reap all the benefits of its bargain for any number of reasons, including its own breach of the contract. It is reasonable to expect a new franchisee to receive the greatest benefits from the franchisor's name and goodwill during the initial start-up period when the franchisee is beginning to attract a business following and public recognition. Therefore, it does not

appear unjust that plaintiff should receive, and that defendant should have paid, the largest payments for the franchise during the first few years of the franchise.

### 5. *The award of attorney fees to plaintiff*

Defendant finally argues that if it is successful in any of its contentions on appeal, then plaintiff cannot be considered the prevailing party in the lawsuit and is therefore not entitled to attorney fees under the contract. Since we have rejected defendant's contentions, we allow the award of $10,000 attorney fees to plaintiff to stand.

## PLAINTIFF'S CROSS-APPEAL

Plaintiff assigns as error the trial court's award of attorney fees to defendant Ignatovich. As noted above, plaintiff entered into the franchise agreement with Perry, who thereafter assigned the contract to Stardust. Perry and Ignatovich were partners in Stardust, but Ignatovich did not have a personal interest in the agreement. Plaintiff was unaware of this, and at the close of plaintiff's case, Ignatovich moved to dismiss the suit in equity against him. The trial judge granted that motion on the basis that Ignatovich had no interest in the contract, and awarded attorney fees of $2,000 to Ignatovich pursuant to ORS 20.096(1), which provides:

"In any action or suit on a contract, where such contract specifically provides that attorney fees and costs incurred to enforce the provisions of the contract shall be awarded to one of the parties, the prevailing party, whether that party is the party specified in the contract or not, at trial or on appeal, shall be entitled to reasonable attorney fees in addition to costs and necessary disbursements."

At the time of the litigation, ORS 20.096(3) defined "prevailing party" as one "in whose favor final

judgment or decree is rendered."[8] The contract provided that in the event of litigation, the prevailing party would be entitled to court costs and reasonable attorney fees.

The legal question, one of first impression, is whether a litigant who was not a signatory party to a contract can recover fees pursuant to ORS 20.096. The difficulty arises from the ambiguity of the terms "party" and "prevailing party" as used in the statute. On the face of the statute, it would appear that Ignatovich is a person who is "the prevailing party, whether he is the party specified in the contract or not," and who is thus entitled to attorney fees. Plaintiff, however, urges a narrow construction of the statute, arguing that "the purpose of the statute is merely to make one-way contract provisions for attorney fees reciprocal." *Bliss v. Anderson,* 36 Or App 559, 562, 585 P2d 29 (1978), *rev. denied* 285 Or 73 (1979). If this is the correct reading then, arguably, Ignatovich would not be a prevailing party because he was not a signatory of the contract. We note, however, that even this interpretation does not dispel the ambiguity, because it is not clear whether reciprocity would exist only among signatories, or among all parties to a dispute based upon breach of the contract.

In deciding this question of first impression, we note that the California courts have considered the same question with regard to California Civil Code § 1717, the California statute on the award of attorney's fees in a contract action which is substantially similar to our Oregon statute.[9] In *Pas v. Hill,* 87 Cal App 3d

---

[8] ORS 20.096 was amended in 1979, and ORS 20.096(3) became ORS 20.096(5). Or Laws 1979, ch 735, § 1. The definition of "prevailing party," however, is unchanged.

[9] California Civil Code § 1717 reads as follows:

'In any action on a contract, where such contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of such contract, shall be awarded to one of the parties,

521, 151 Cal Rptr 98 (1978), the court discussed the case of *Babcock v. Omansky,* 31 Cal App 3d 625, 107 Cal Rptr 512 (1973), in which the court held that a wife who was sued with her husband upon the husband's notes, to which she was found not to be a party, could recover attorney fees from plaintiff. The California Supreme Court later upheld the *Pas* court's conclusions in *Reynolds Metals Co. v. Alperson,* 25 Cal 3d 124, 128-29, 599 P2d 83, 158 Cal Rptr 1 (1979). The *Pas* court reasoned as follows:

> "We do not disagree with the result in *Babcock.* In our view the key to that decision is that the plaintiffs who were parties to the promissory notes pleaded and attempted to prove that the defendant wife was a party to the notes or liable on the notes as a joint venturer and *had the plaintiffs prevailed on that cause of action, the plaintiffs would have been entitled to an award of attorney fees against the defendant wife under the notes' unilateral attorney fee provisions.* The decision according the defendant wife the reciprocal right to recover attorney fees when she successfully defended by proving she was not a joint venturer was required by fairness and was wholly consonant with and in furtherance of the legislative purpose behind Civil Code section 1717. Although that question is not now before us, we think it likely a sound basis for the decision in *Babcock* can be predicated on the doctrine of equitable estoppel—e.g., the plaintiffs having alleged and attempted to prove the defendant wife was a party to the notes as a joint venturer and that she was liable under the notes' attorney fee provisions and having caused defendant wife to defend against such liability, were estopped to

the prevailing party, whether he is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements.

"Attorney's fees provided for by this section shall not be subject to waiver by the parties to any contract which is entered into after the effective date of this section. Any provision in any such contract which provides for a waiver of attorney's fees is void.

"As used in this section, 'prevailing party' means the party in whose favor final judgment is rendered."

[511]

deny defendant wife was a party to the contract for the remedial purposes of Civil Code section 1717." 87 Cal App 3d at 535-536. (Emphasis in original.)

The above reasoning is applicable to the facts of this case. Plaintiff sued defendant Ignatovich on the contract. In its amended complaint, plaintiff stated that after it had signed an agreement with Perry, he assigned his agreement to Stardust and Ignatovich, who "acquired the rights and obligations of said agreement." Had plaintiff prevailed at trial, it would have been entitled to an award of attorney fees against Ignatovich. Ignatovich was obliged to hire counsel and defend this suit; since he was able to get a decree dismissing plaintiff's cause of suit against him, he became a prevailing party. The trial court was correct in awarding him fees pursuant to the contract and ORS 20.096.

We affirm.