Argued and submitted December 12, 1989, reassigned April 30, the decision of the Court of Appeals and the judgment of the circuit court affirmed June 14, 1990

# NORTHWEST MEDICAL LABORATORIES, INC.,
and East Portland X-Ray Clinic, P.C.,
*Petitioners on Review,*

*v.*

# BLUE CROSS AND BLUE SHIELD OF OREGON, INC.,
Oregon Preferred Care Network, Inc.,
Good Samaritan Hospital and Medical Center, Inc.,
and Northwest Physicians Association, Inc.,
*Respondents on Review.*

(CC A8604-01953; CA A46938; SC S36303)

794 P2d 428

Michael J. Morris, of Bennett, Hartman, Tauman & Reynolds, P.C., Portland, argued the cause and filed the petition for petitioners on review.

E. Walter Van Valkenburg, of Stoel Rives Boley Jones & Grey, Portland, argued the cause and filed the response to the petition for respondents on review.

Roger Tilbury and Roch Steinbach, Portland, filed a brief

on behalf of *amicus curiae* Portland Retail Druggists Association.

Before Peterson, Chief Justice, and Linde, Carson, Jones, Gillette, Van Hoomissen and Fadeley, Justices.**

PETERSON, C. J.

---

** Linde, J., retired January 31, 1990; Jones, J., resigned April 30, 1990.

## PETERSON, C. J.

Plaintiffs appealed to the Court of Appeals from the trial court's denial of their request for an injunction and other equitable relief under Oregon's "Little Sherman Act," ORS 646.725.[1] Plaintiffs alleged that defendants conspired to refuse to deal with them, thereby denying them access to a market necessary for effective competition.

Defendants are Blue Cross and Blue Shield of Oregon, Inc. (BCBSO); Oregon Preferred Care Network, Inc. (OPCN); Good Samaritan Hospital and Medical Center, Inc. (Good Samaritan); and Northwest Physicians Association, Inc. (NPA). Plaintiffs are Northwest Medical Laboratories, Inc., an independent laboratory that provides testing and similar services, and East Portland X-Ray Clinic, P.C., an independent clinic that provides radiology services. After *de novo* review in equity, ORS 19.125(3), *see* ORS 646.770, the Court of Appeals affirmed the judgment of the trial court. *NW Medical Lab. v. Blue Cross and Blue Shield,* 97 Or App 74, 775 P2d 863 (1989). We in turn review *de novo, see* ORS 19.125(4), and affirm the decision of the Court of Appeals.

## I. FACTS

The parties "accept the statement of facts contained in the Court of Appeals' opinion." We adopt those findings on *de novo* review and begin with those facts:

> "The health care financing industry has changed significantly in recent decades. Under traditional 'indemnity' health insurance plans, the subscriber pays a premium to the insurer, and the insurer then indemnifies the subscriber for payments made for health care services. The subscriber is able to select any doctor or hospital that the subscriber wishes. Until recently, the only other type of medical service financing available in the Portland area was Kaiser Permanente, a

---

[1] ORS 646.725 provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal."

Section 1 of the Sherman Antitrust Act, 26 Stat 209, 15 USC § 1 (1890), in part provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

'closed panel' health maintenance organization (HMO), originally organized by Kaiser Industries during World War II to provide health care services to Kaiser employes. An individual covered by Kaiser usually must have medical services performed by the physicians of Northwest Permanente, P.C., or pay the cost himself.

"The cost of providing health care services has risen in recent years, and so have the premiums for traditional indemnity type insurance plans. In an effort to reduce the cost of premiums to the subscriber, to reduce the cost of services and to compete with Kaiser and traditional indemnity programs, competitors have developed new concepts for the financing of health care. There are now six HMOs competing in the Portland metropolitan area, including Network Health Plan, the HMO organized by defendant OPCN.

"HMOs charge a fixed sum and provide full health care services to subscribers for that fee. Typically, the HMO limits the hospitals and physicians whose services are covered by the plan. A 'staff model' HMO owns its own facilities and employs physicians on salary. A 'group model' HMO, like Kaiser, does not employ physicians, but contracts with a single group practice for medical services. A 'network model' HMO contracts with groups of doctors in multi-speciality [sic] groups. The most common HMO is the independent practice model, which, like OPCN, contracts with independent practice medical associations that, in turn, contract with independent health care providers practicing in their own facilities. A plan that limits the providers whose services are covered is a 'closed panel' plan.[2]

"The competitive strategy of an HMO is to provide complete medical services at less cost than traditional indemnity insurance by controlling unnecessary use of services and promoting preventive medicine. HMOs do this by placing the participating providers at financial risk with respect to the overall performance of the plan, thereby providing an incentive to the providers to reduce costs and unnecessary medical services.

"In early 1984, representatives of three Portland hospitals, including defendant Good Samaritan, met with defendant BCBSO to discuss the possibility of forming an HMO to provide a plan that would compete with the existing Portland area HMOs and other health care plans.[3] Each hospital obtained the participation of a segment of the physicians on its staff. The physicians, in turn, organized separate independent practice associations, one of which is defendant Northwest Physicians Association, Inc.

"In June, 1984, BCBSO, the three hospitals and three independent practice associations joined together to form a new corporation, defendant OPCN. BCBSO contracted with OPCN to obtain the necessary health care services. OPCN then contracted with the individual provider members to the extent necessary to provide complete services. Each of the seven separate corporations was a member of OPCN, had a representative on its board of directors and contributed $15,000 toward the initial capitalization of the corporation. Later, each contributed another $15,000.

"OPCN developed Network Health Plan (Network). Subscribers to the plan pay a fixed fee for full health care services to be provided by the hospitals, physicians and other service providers designated as Network providers. The Network providers continued to sell health care services to patients not enrolled in Network. The plan is marketed by BCBSO in the Portland area only.[4]

"All Network providers are required to participate in a utilization review and quality assurance program, designed to monitor the quality of service and to eliminate the use of needless services, and thereby to control costs and to reduce the price of medical care to consumers. Providers must also accept a discounted fee for the services they render, in order to create a 'risk pool,'[5] and must agree to refer patients covered by the plan only to Network providers.

"Dr. John Santa, Medical Director of Network, testified that OPCN is a 'closed panel' HMO. Subscribers must seek services from providers in the plan, except in the case of an emergency. Agreements between physician providers and the three independent practice associations provide:

'If Physician determines that a Beneficiary requires services not customarily provided by Physician, including without limitation physician services, services of other health care professionals, in-patient hospital services, ancillary hospital services, and laboratory services, Physician will, to the extent possible consistent with good medical practice and patient care, refer, admit or direct the beneficiary to other Program Participants in order to maintain the integrity of the Program and further the interests of NETWORK and the Beneficiary in securing health care services for the Beneficiary in a cost-effective manner. Physician will obtain the consent of the Medical director of NETWORK prior to making any non-emergency referrals to non-Program Participants.'

"Santa testified that the reasons for limiting the number of

providers available under the plan are to enable the HMO to control the quality of service, to keep the plan manageable in size and to ensure that all providers are at risk, but not at too much risk. OPCN chose to use the laboratory and radiology services of plan members Good Samaritan and Portland Adventist Hospitals. It also 'locked-in' the services of one radiologist, several anesthesiologists, mental health services, vision services and a durable medical equipment supplier.

"Clinical laboratories are regulated by ORS ch 438 and may accept referrals only from a licensed physician or other persons authorized by law. There are many independent laboratories and hospitals in the Portland metropolitan area competing for physicians' laboratory referrals. Plaintiff Northwest Medical Laboratories is located two blocks from Good Samaritan Hospital.

"Radiologists also depend on physician referrals. Clinics compete on the basis of quality of service. Local hospitals also market radiology services to physicians' offices. Plaintiff East Portland X-Ray Clinic is located six blocks from Portland Adventist Medical Center.

"Both Northwest Medical Laboratories and East Portland X-Ray sought to become providers for the plan, but OPCN rejected them because of its decision to rely on member hospitals for those services. Until January 1, 1986, however, OPCN reimbursed plaintiffs for services provided to Network subscribers on referrals from member doctors. After that date, it refused to reimburse them. Plaintiffs claim that they have lost significant revenue as a result of this 'lock-in' of radiological and laboratory services.

"The plan competes in at least three market categories in the Portland metropolitan area. Network physician providers make up approximately 16.5 to 18.5 percent of all physicians practicing. The hospital providers represent approximately 24 percent of the hospital market. * * * Subscribers to the plan comprise approximately 2.1 percent of the insured population of Portland and 5 percent of those participating in HMOs in that area. * * *

"Plaintiffs contend that OPCN's 'lock-in' of laboratory and radiology services violates Oregon's antitrust law, specifically ORS 646.725, which prohibits all contracts or combinations 'in restraint of trade or commerce * * *.' Their only argument on appeal and, therefore, the only one that we consider, is that the arrangement constitutes a refusal to deal that falls within the statutory prohibition. That refusal is in restraint of trade, plaintiffs contend, because it disturbs the

'normal dynamics of the market' by requiring doctors who would ordinarily refer their patients to plaintiffs to refer them to plan providers only. Plaintiffs claim that they have been damaged by the loss of revenue.

"Theodore Tosterud, the president and primary shareholder of Northwest Medical Laboratories, testified:

'Q: * * * Can you explain to the court how your business has been threatened with injury as a result of the lock-in?

'A: If physicians in the Northwest area that we're doing business with are physicians that are involved in the Network Health Plan, and before Network Health Plan we were receiving all the physicians' work from these doctors, now we do not receive all their work. They must split it up. The portion that is Network patients goes to the Network provider and the other part of their work goes to Northwest Medical Laboratories.

'Q: All right. Now, so it's clear, you aren't claiming that all the doctors who signed up for Network were formerly your accounts?

'A: Not all of them, no.

'Q: But of the ones that were your accounts and signed up for Network, you have lost that portion of your business?

'A: I have lost that portion of that business that they drew with the Network Health Plan.

'Q: And those same doctors continue to send you business on your other non-Network people?

'A: That's correct.'

"Tosterud testified, additionally, that Northwest Medical Laboratories continues to receive a large number of referrals of clients insured by BCBSO under other plans, accounting for approximately 10 percent of its gross revenue. It also continues to receive a significant number of referrals of non-Network patients from doctors who are Network providers.

"Gerald Warnock testified on behalf of plaintiff East Portland X-Ray Clinic. He is on the staff of both Portland Adventist Hospital and Good Samaritan Hospital. His clinic participates in every pre-paid health care plan available to it. It applied to become a provider for Network, but OPCN rejected it. Warnock estimates that East Portland X-Ray lost gross revenue of $100,000 in 1986 as a result of being locked

out of Network. That clinic's gross revenue in 1986 was approximately $4,000,000. It continues to receive significant revenues from BCBSO under its non-Network plans and participates in other closed-panel plans in which it is 'locked-in' as the provider of radiology services.

---

"[2] In 1973, Congress enacted the Health Maintenance Organization Act, 42 USC § 300(e), to facilitate the formation and operation of HMOs by making federal financial assistance available and preempting state laws that interfered with their operation. Congress specifically authorized 'closed panel' HMOs.

"[3] Plaintiffs concede that the HMO was formed in an effort to reduce premiums for prepaid health insurance and to compete with Kaiser.

"[4] In early 1986, in order to satisfy federal requirements, the owners of OPCN other than BCBSO, including Good Samaritan and Northwest Physicians Association, formed a new joint venture called Northwest Health, Inc. Defendants concede that, if Good Samaritan and Northwest Physicians Association are enjoined from participating in a closed panel HMO, they would also be barred from participation in Northwest Health, Inc.

"[5] The providers accept 80 percent of their normal fee as payment at the time of the service. The remaining 20 percent is placed in the risk pool. If the providers are successful in controlling excess utilization, all or part of the risk pool is distributed to them at the end of the fiscal year. If they are not successful, distribution is minimal or nonexistent. Under the Administrative Services Agreement between OPCN and BCBSO, BCBSO provides 'stop loss' coverage to OPCN, which is triggered when claims exceed an agreed percentage of collected premiums. For the segment of services that the stop loss covers, coverage is unlimited. Losses that the stop loss does not cover become OPCN's operating deficit. We find that, through their contribution of capital and participation in the risk pool, the providers were genuinely 'at risk.' " 97 Or App at 76-81. (Some footnotes omitted.)

## II. THE APPLICABLE RULES

In this section of the opinion we will briefly discuss the development of what has come to be known as two rules of Sherman Act antitrust federal law, the "rule of reason" and the "*per se* rule." We will then state our interpretation of the

*per se* rule under ORS 646.725 in a refusal-to-deal context. In parts B and C of section III, *post,* we will apply the *per se* rule and the rule of reason to the facts of this case.

There are no reported Oregon cases applying ORS 646.725 in a context similar to the facts at issue. The reported Oregon cases interpreting ORS 646.725 are *King City Realty v. Sunpace,* 291 Or 573, 633 P2d 784 (1981), and *Golden West Insulation v. Stardust Investment Co.,* 47 Or App 493, 615 P2d 1048 (1980). Both cases concern "tying" arrangements.

ORS 646.715(2) provides in part:

> "The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS [646.725]."

Read literally, ORS 646.725 and section 1 of the Sherman Act prohibit every agreement in "restraint of trade." The Supreme Court of the United States recognized early that such an interpretation would overly fetter freedom of contract without resulting in more active competition in the market involved. In *Standard Oil Co. v. United States,* 221 US 1, 60, 31 S Ct 502, 55 L Ed 619 (1911), the Supreme Court advanced the rule-of-reason standard by construing the Act to prohibit only contracts in *unreasonable* restraint of trade. Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 US 36, 49, 97 S Ct 2549, 53 L Ed 2d 568 (1977).

In order to simplify the process of determining whether certain practices unreasonably restrain trade, the Supreme Court developed a *per se* rule of illegality. Under this rule, a practice that facially has the likelihood of predominantly anticompetitive effects (that is, would always or almost always restrict competition without any offsetting market efficiencies) is illegal *per se. See Northwest Stationers v. Pacific Stationery,* 472 US 284, 289-90, 105 S Ct 2613, 86 L Ed 2d 202 (1985). The "*per se* approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive. Courts can thereby avoid the 'significant costs' in 'business certainty and litigation efficiency' that a full-fledged rule-of-reason inquiry

entails." *Id.,* 472 US at 289 (quoting *Arizona v. Maricopa County Medical Society,* 457 US 332, 343-44, 102 S Ct 2466, 73 L Ed 2d 48 (1982)).

In *Northwest Stationers,* the Supreme Court refined the *per se* rule as applied to a refusal to deal where the defendant expelled plaintiff from a joint buying cooperative. In that case the Court held that a plaintiff, who asserted that expulsion from a joint buying cooperative is illegal *per se,* must present a threshold case that the cooperative possesses market power or unique access to a business element necessary for effective competition. 472 US at 298.

In light of ORS 646.715(2) — which requires that we look to federal case law — and after reviewing federal case law, we interpret ORS 646.725 as follows: A challenged practice violates ORS 646.725 only if the practice constitutes an *unreasonable* restraint of trade. The rule of reason is the appropriate analysis unless the practice is illegal *per se.* A *per se* violation is unreasonable as a matter of law. In a refusal-to-deal context, a plaintiff seeking application of the *per se* rule must present a threshold case that a defendant who possesses market power or unique access to a business element necessary for effective competition has refused to deal. If the plaintiff meets this threshold showing, the defendant can avoid judgment under the *per se* rule by establishing that the practice is justified by plausible arguments that it was intended to enhance overall efficiency and make markets more competitive.[2]

---

[2] Then Professor and later Judge Robert Bork has commented on the procedural implications of the *per se* rule:

"Suppose that the government brings suit charging defendants with agreeing to an illegal division of markets. The first step is to determine whether the facts and contentions of the parties properly bring the case within the ambit of the per se rule. If a per se violation seems proven either by the pleadings or at any stage during the trial, the court should announce that fact. At this point the defendants could avoid judgment against themselves and obtain an opportunity to go on with the trial only by making an acceptable offer to prove that the market division was ancillary. This would require an offer to prove a contract integration (unless that were conceded) and, in any case, the statement of an economically plausible theory which, if borne out by the evidence the defendants offer to adduce, would show their agreement to have a substantial capacity for increasing the efficiency of the integration. * * * [T]he economics involved in judging the plausibility of defendants' theory, and thus the acceptability of their offer of proof, are not overly complex and are suitable for judicial use in the litigation process. Many trials will end at this point with a decision that defendants have not offered a plausible theory of efficiency." Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division* (Part II), 75 Yale L J 373, 388-89 (1966).

## III. ANALYSIS

### A. The Joint Venture Issue

■ ■ We first dispose of a preliminary issue. Relying on language from *Arizona v. Maricopa County Medical Society,* 457 US 332, 102 S Ct 2466, 73 L Ed 2d 48 (1982), defendants argue that we need not engage in any antitrust analysis because they have formed a "true joint venture." They maintain that they are a single firm competing with others in the market and have complete freedom to choose those with whom they will deal.

In *Maricopa,* the State of Arizona brought an antitrust action against two foundations that had established schedules of maximum fees that participating doctors would accept as payment in full for services performed for patients insured under plans approved by the foundations. The Court held that the maximum-fee agreements were *per se* unlawful under section 1 of the Sherman Act. Defendants here rely on the following statement:

> "The foundations are not analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. In such joint ventures, the partnership is regarded as a single firm competing with other sellers in the market. The agreement under attack is an agreement among hundreds of competing doctors concerning the price at which each will offer his own services to a substantial number of consumers." 457 US at 356-57.

Even if defendants have formed a "true joint venture," they do not automatically escape antitrust laws. We do not read *Maricopa* to hold that a true "joint venture is *ipso facto* free from antitrust scrutiny."[3] Some of the most signifi-

---

[3] In context, the Court of Appeals correctly reasoned:

"The language quoted from *Arizona v. Maricopa County Medical Society, supra,* addresses the question of why the Court considered the arrangement there to involve more than 'literal price fixing.' Here, there is no contention that price fixing is involved. The only claimed violation is a refusal to deal. The Court's discussion in *Maricopa,* therefore, is not directly applicable. Additionally, read in the context of the Supreme Court's entire opinion, the quoted language only suggests that, if the arrangement in *Maricopa* had involved some greater level of integration between the foundations and the insurance providers, it could have been saved from *per se* illegality. It does not suggest, and we do not read it to hold, that an arrangement that constitutes a joint venture is *ipso facto* free from anti-

cant antitrust cases have held joint ventures to be culpable.[4] In determining whether defendants' actions have violated ORS 646.725, we look at substance, not form. We turn, therefore, to a discussion of plaintiffs' claims.

## B. *Per se* Analysis

Plaintiffs argue that the agreements between the Network providers to not refer laboratory and radiology services to plaintiffs constitute a group boycott (a refusal to deal) and on their face are a *per se* violation of ORS 646.725.

*Northwest Stationers v. Pacific Stationery,* 472 US 284, 105 S Ct 2613, 86 L Ed 2d 202 (1985), is instructive concerning the application of the *per se* rule in a refusal-to-deal context. In that case, the defendant was a wholesale purchasing cooperative whose membership consisted of office supply retailers. The defendant expelled the plaintiff from membership. Thereafter, the plaintiff brought suit alleging that the expulsion without procedural protection was a group boycott that limited its ability to compete and should be considered *per se* violative of section 1 of the Sherman Act.

The Court stated that " '[g]roup boycotts' are often listed among the classes of economic activity that merit *per se* invalidation under § 1[, but] [e]xactly what types of activity fall within the forbidden category is * * * far from certain." 472 US at 293-94. (Citations omitted.) Accordingly, the Court took "[s]ome care * * * in defining the category of concerted refusals to deal that mandate *per se* condemnation." 472 US at 294. The Court summarized its treatment of refusal-to-deal cases under the *per se* rule:

> "Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to

---

trust scrutiny. Firms that are genuinely joined together for the accomplishment of some business purpose are capable of acting concertedly and anti-competitively through a refusal to deal. We hold that, as a general proposition, although the extent of integration among firms engaged in a common enterprise may be relevant to the question of whether the arrangement should be treated as an illegal combination *per se*, characterizing an agreement as a 'joint venture' says nothing about the effect of the arrangement on competition and does not mean that the entity is free from antitrust scrutiny." 97 Or App at 85. (Some citations omitted.)

[4] *See, e.g., United States v. Sealy, Inc.,* 388 US 350, 87 S Ct 1847, 18 L Ed 2d 1238 (1967).

disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.' In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, and frequently the boycotting firms possessed a dominant position in the relevant market. In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.

"Although a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment, not every cooperative activity involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood of predominantly anticompetitive consequences." 472 US at 294-95. (Citations omitted.)

Turning to the facts of that case, the Court identified several efficiency-enhancing characteristics of wholesale purchasing cooperatives in general and found efficiencies more directly related to the defendant's expulsion of the plaintiff from the cooperative:

"Wholesale purchasing cooperatives such as [defendant] are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects. Rather, such cooperative arrangements would seem to be 'designed to increase economic efficiency and render markets more, rather than less, competitive.' *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* [441 US 1, 20, 99 S Ct 1551, 60 L Ed 2d 1 (1979)]. The arrangement permits the participating retailers to achieve economies of scale in both the purchase and warehousing of wholesale supplies, and also ensures ready access to a stock of goods that might otherwise be unavailable on short notice. The cost savings and order-filling guarantees enable smaller retailers to reduce prices and maintain their retail stock so as to compete more effectively with larger retailers.

"[Plaintiff], of course does not object to the existence of the cooperative arrangement, but rather raises an antitrust challenge to [defendant's] decision to bar [plaintiff] from continued membership. It is therefore the action of expulsion that must be evaluated to determine whether *per se* treatment

is appropriate. The act of expulsion from a wholesale cooperative does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* [*supra,* 441 US] at 9. Wholesale purchasing cooperatives must establish and enforce reasonable rules in order to function efficiently. Disclosure rules, such as the one on which [defendant] relies, may well provide the cooperative with a needed means for monitoring the creditworthiness of its members. Nor would the expulsion characteristically be likely to result in predominantly anticompetitive effects, at least in the type of situation this case presents. Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted." *Northwest Stationers v. Pacific Stationery, supra,* 472 US at 295-96. (Footnotes and some citations omitted.)

In holding that the defendant's expulsion of the plaintiff did not fall within the category of activity that is, as a matter of law, anticompetitive so as to mandate *per se* invalidation under section 1 of the Sherman Act, the Court stated:

"A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive. When the plaintiff challenges expulsion from a joint buying cooperative, some showing must be made that the cooperative possesses market power or unique access to a business element necessary for effective competition." 472 US at 298.

We interpret *Northwest Stationers* to stand for the proposition that a plaintiff seeking application of the *per se* rule to an alleged concerted refusal to deal must present a threshold case that a defendant who possesses market power or unique access to a business element necessary for effective competition has refused to deal. The logical extension of *Northwest Stationers* is that if the plaintiff meets this threshold showing, the defendant must establish that the practice is justified by plausible arguments that it was intended to enhance overall efficiency and make markets more competitive.

We realize that the above approach may blur the distinction between the *per se* and rule-of-reason approaches. The Supreme Court of the United States, however, has recognized that "there is often no bright line separating *per se* from Rule of Reason analysis." *NCAA v. Board of Regents of Univ. of Okla.,* 468 US 85, 104 n 26, 104 S Ct 2948, 82 L Ed 2d 70 (1984). These two approaches, however, may be distinguished by the depth of inquiry. *See Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F2d 185, 189 (7th Cir 1985).

██ Turning to the facts at bar, we must first identify the relevant market. In this case, it is the laboratory and radiology markets. The relevant geographic market is the Portland metropolitan area, the only area in which BCBSO offers Network.

█ Plaintiffs have failed to present a threshold case that defendants possess — through the arrangements between Network and other providers — market power or unique access to a business element necessary for effective competition in the medical laboratory and radiology markets. With respect to market power, there is no evidence concerning the percentage of laboratory and radiology markets that defendants occupy. There is also no evidence by direct inference. The only available evidence is that subscribers to Network comprise only approximately 2.1 percent of the total market for health insurance in Portland.

Concerning unique access to a business element necessary for effective competition, the facts show that plaintiffs are effectively competing in the laboratory and radiology markets. We find that Northwest Medical Laboratories receives a large number of referrals of clients insured by BCBSO under other plans, which accounts for approximately 10 percent of its gross revenue. Furthermore, doctors who are Network providers continue to refer a significant number of non-Network patients to that laboratory. We also find that East Portland X-Ray's 1986 gross revenue was approximately $4,000,000, reflecting a Network lock-out loss of $100,000. East Portland also continues to receive significant revenues from BCBSO under non-Network plans. Additionally, East Portland is the "locked-in" provider of radiology services in other closed-panel plans. Under these facts, it is clear that plaintiffs' ability to compete is not dependent upon their ability to become Network providers.

In sum, plaintiffs have failed to make the required threshold showing that defendants' actions are illegal *per se.* We therefore turn to the generally applicable rule of reason.

## C. Rule-of-Reason Analysis

 Application of the rule of reason to the instant facts is not a difficult task. The basic inquiry is whether the restraint in question "is one that promotes competition or one that suppresses competition." *National Soc. of Professional Engineers v. U.S.,* 435 US 679, 691, 98 S Ct 1355, 55 L Ed 2d 637 (1978). Plaintiffs have failed to show that the refusal to deal has injured competition in any way. The fact that these particular plaintiffs may have lost business does not demonstrate any injury to competition.

In contrast to the absence of anticompetitive impact, there was evidence of the procompetitive impact of defendants' conduct. The evidence shows that one of the central concepts behind the formation of Network was the use of a limited panel of providers in order to control utilization while ensuring that quality remained high. As stated in the above-mentioned facts, "[a]ll Network providers are required to participate in a utilization review and quality assurance program, designed to monitor the quality of service and to eliminate the use of needless services, and thereby to control costs and to reduce the price of medical care to consumers." Dr. John Santa, Medical Director for Network, testified about the efficiencies that result from a health plan's use of a limited panel of providers in conjunction with a risk-pool feature. Dr. Santa also testified that it was important to limit the number of providers on the panel in order to make utilization controls work. He contrasted Network with an earlier plan that had "basically taken * * * virtually all providers in the Portland Metro area and they had some very significant problems." We accept this testimony as a portrayal of accurate historical fact.

In addition, defendants' share of the health insurance market is so small that any overall anticompetitive effect is questionable.

In short, defendants have employed procompetitive concepts to create an entity that competes in the laboratory and radiology markets. It was plaintiffs' burden to prove that defendants' conduct was anticompetitive, and plaintiffs have

not done so. Accordingly, plaintiffs have failed to establish a rule-of-reason claim under ORS 646.725. *Cf. Seaboard Supply Co. v. Congoleum Corp.*, 770 F2d 367, 375 (3d Cir 1985).[5]

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

[5] In that case, plaintiff Seaboard, a long-standing wholesale distributor of Congoleum products, brought suit against Congoleum and a new commissioned sales agent alleging, *inter alia*, that defendants had conspired to boycott Seaboard. The court stated:

"The district court also found that Seaboard had failed to present evidence which would establish anti-competitive effect and therefore could not prevail on a rule of reason analysis. Plaintiff produced evidence only of its own decrease in sales of Congoleum products. The defendants' evidence showed, however, that intrabrand competition increased and, by using a sales agent, Congoleum was able to reduce its market prices and compete more effectively with other manufacturers. In this situation we must not overlook the Supreme Court's admonition in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 US 477, 488, 97 S Ct 690, 50 L Ed 2d 701 (1977), 'The antitrust laws, however, were enacted for "the protection of *competition*, not *competitors*." ' We noted earlier the absence of evidence tending to show an anti-competitive effect. On this record, the district court did not err in finding that plaintiff had failed to present a rule of reason claim under section 1 of the Sherman Act." (Emphasis in original; footnote omitted.)